**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| **DENISE BONFILIO,** | ) |
|  | ) |
| Petitioner, | ) |
|  | ) CIVIL NO. 15-1015 |
| v. | ) (CRIMINAL NO.  09-205) |
|  | ) |
| **UNITED STATES OF AMERICA,** | ) |
|  | ) |
| Respondent. | ) |
|  | ) |
|  | ) |

## MEMORANDUM OPINION

**CONTI, Chief District Judge.**

### I.  Introduction

Petitioner Denise Bonfilio ("Bonfilio" or "Petitioner") filed a motion to vacate, set aside, or correct sentence by a person in federal custody pursuant to 28 U.S.C. § 2255 (the "§ 2255 motion") on August 4, 2015. (ECF No. 249.)[1] Upon reviewing the submissions of the parties, including Petitioner's § 2255 motion, the addenda to Petitioner's § 2255 motion (ECF Nos. 266, 269, and 270), the government's response to Petitioner's § 2255 motion (ECF No. 254), and the government's response to Petitioner's addenda (ECF No. 268), the court will deny Petitioner's § 2255 motion for the reasons set forth herein.

---

[1] The docket references ("ECF No.") in this opinion are references to the docket in the criminal case, Criminal No. 09-205.

## II. BACKGROUND

On June 23, 2009, a federal grand jury returned a nine-count indictment charging Bonfilio with eight counts of wire fraud pursuant to 18 U.S.C. § 1343 and one count of money laundering conspiracy, pursuant to 18 U.S.C. § 1956(h). (ECF No. 1.) These charges arose from Bonfilio's participation in a mortgage-fraud scheme, whereby she recruited a number of co-conspirators *inter alia* to submit false mortgage applications and sales agreements, acquire inflated appraisals, and execute false settlement statements. Many of Bonfilio's coconspirators pleaded guilty to related charges, including Bonfilio's life partner, Deborah Kitay ("Kitay") (09-CR-172), and two of her mortgage brokers, David McCloskey ("McCloskey") (09-CR-225) and Jay Berger ("Berger") (09-CR-283).

On July 7, 2009, Bonfilio entered a plea of not guilty to all counts. (ECF No. 10.) Over the course of the fifteen-day trial, the government presented substantial documentary and testimonial evidence to support the charges that Bonfilio and her coconspirators engaged in a mortgage fraud scheme spanning from June 2005 to April 2008, involving eight different properties. (ECF. No. 1.) At trial, the government called 19 witnesses to testify against Bonfilio. (ECF Nos. 164–170.) Government witnesses included Kitay, Bonfilio's life partner and coconspirator (ECF Nos. 164–65, 234); Berger, a mortgage broker and coconspirator (ECF Nos. 181, 231–33); Carrie Marraro, a friend and coconspirator (ECF Nos. 166, 173); Tony Tholtsiniathis, Kenneth Maietta, and Richard Schectman, three of Bonfilio's victims (ECF Nos. 165–66, 235); Neal Caldwell, a special agent with the Federal Bureau of Investigation (ECF No. 231); several of Bonfilio's business associates in the real estate field, including an attorney (ECF No. 167), mortgage broker (ECF No. 168), investor (ECF No. 170), and individuals involved in real estate settlement services and title insurance (ECF Nos. 167, 168); several individuals who

sold their homes to Bonfilio (ECF Nos. 167, 168, 170); and multiple experts, including banking, real estate, and finance experts (ECF Nos. 168, 169, 170, 235). The government also played an incriminating tape recording of a conversation Bonfilio had with Berger, which was made while Berger was wearing a recording device. (ECF No. 232.) Hundreds of pieces of documentary evidence were offered into the record. [2] (ECF No. 104.)

On September 24, 2012, a jury convicted Bonfilio of eight counts of wire fraud and one count of money laundering conspiracy. (ECF No. 102.) On January 24, 2014, the court sentenced Bonfilio to 120 months of imprisonment at each count of the indictment, to be served concurrently; three years of supervised release at each count, to be served concurrently; and $2,024,548.86 in restitution. [3]

On August 4, 2015, Bonfilio filed a timely *pro se* motion to vacate her sentence under 28 U.S.C. § 2255. (ECF No. 249.) On September 18, 2015, the government filed a response to Bonfilio's initial § 2255 motion. (ECF No. 254.)

On December 8, 2015, the court granted Bonfilio's request for the appointment of counsel to represent her in connection with her § 2255 motion. (ECF Nos. 258, 261.) On March 14, 2016, Bonfilio filed an addendum to her § 2255 motion through counsel. [4] (ECF No. 266.) On April 6, 2016, the government filed a response to Bonfilio's § 2255 addendum. (ECF No. 268.) On May 4, 2016, the court held a status conference at which the parties presented

---

[2] At sentencing, this court determined that the government's case against Bonfilio was overwhelming. (ECF No. 225 at 130.) ("I did hear the testimony at trial, and it was overwhelming in terms of what your role was and what your involvement was.").

[3] On May 28, 2015, the United States Court of Appeals for the Third Circuit remanded this court's restitution order to "clarify that Bonfilio and [Deborah] Kitay's restitution obligations are joint and several." United States v. Bonfilio, 611 F. App'x 758, 759 (3d Cir. 2015).

[4] Though she is now represented by counsel, Bonfilio filed two *pro se* "supplemental responses" related to her § 2255 motion. (ECF Nos. 269, 270.) The court did not strike these responses, and considered the arguments raised therein for purposes of completing the record.

argument with respect to whether the court should hold an evidentiary hearing on Bonfilio's § 2255 motion. <u>See</u> (Text Minute Entry, 5/4/2016.)[5]

Bonfilio asks the court to vacate her sentence on four grounds:

(1) the government violated her due process rights under <u>Brady v. Maryland</u>, 387 U.S. 83 (1963), by failing to inform her before trial about an alleged agreement it had with witness Kitay; and the government violated her rights under <u>Napue v. Illinois</u>, 360 U.S. 264 (1959), by failing to correct Kitay's allegedly false testimony denying the existence of such an agreement during the trial;

(2) the government violated her due process rights under <u>Brady</u> by failing to inform her before trial that witness Mark Wolper ("Wolper") allegedly engaged in misconduct that could have been used to impeach his testimony on cross-examination;

(3) then trial counsel for the government, James Garrett, violated her due process rights when he allegedly "assaulted" her then counsel during a recess at trial; and

(4) her trial counsel was ineffective under the Fifth and Sixth Amendments for (1) advising her that the court would hold her in contempt if she elected to testify on her own behalf, (2) failing to "investigate the case by not viewing the electronic evidence readily available at the United States Attorney's office on a view only computer," and (3) failing to file a motion *in limine* to exclude allegedly "forged or otherwise inauthentic documents and instead stipulated [to] these documents['] admission." (ECF No. 249 at 2.)

### III. Standard of Review

Under 28 U.S.C. § 2255, a federal prisoner in custody may move the court which imposed the sentence to vacate, set aside, or correct the sentence upon the ground that "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the

---

[5] Additional background information will be discussed in greater depth below.

maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255. The

Supreme Court reads § 2255 as stating four grounds upon which relief can be granted:

> (1) "that the sentence was imposed in violation of the Constitution
> or laws of the United States;" (2) "that the court was without
> jurisdiction to impose such sentence;" (3) "that the sentence was in
> excess of the maximum authorized by law;" and (4) that the
> sentence "is otherwise subject to collateral attack."

Charles A. Wright, et al., Federal Practice and Procedure § 625 (4th ed. 2011) (quoting Hill v.

United States, 368 U.S. 424, 426–27 (1962)). The statute provides as a remedy for a sentence

imposed in violation of law that "the court shall vacate and set the judgment aside and shall

discharge the prisoner or resentence him or grant a new trial or correct the sentence as may

appear appropriate." 28 U.S.C. § 2255.

"As a collateral challenge, a motion pursuant to [§ 2255] is reviewed much less favorably

than a direct appeal of the sentence." United States v. Travillion, 759 F.3d 281, 288 (3d Cir.

2014) (citing United States v. Frady, 456 U.S. 152, 167–68 (1982)). "Indeed, relief under § 2255

is available only when 'the claimed error of law was a fundamental defect which inherently

results in a complete miscarriage of justice,' and . . . 'present[s] exceptional circumstances where

the need for the remedy afforded by the writ . . . is apparent.'" Id. (quoting Davis v. United

States, 417 U.S. 333, 346 (1974) (internal quotation marks omitted)). The court construes

Petitioner's pro se § 2255 motion liberally, but Petitioner "must abide by the same rules that

apply to all other litigants." Mala v. Crown Bay Marina, Inc., 704 F.3d 239, 244–45 (3d Cir.

2013).

A district court is required to hold an evidentiary hearing on a motion to vacate sentence

filed pursuant to 28 U.S.C. § 2255, unless the motion and records of the case show conclusively

that the movant is not entitled to relief. 28 U.S.C. § 2255 ("Unless the motion and the files and

records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing hereon, determine the issues and make findings of fact and conclusions of law with respect thereto."); United States v. Booth, 432 F.3d 542, 545-46 (3d Cir. 2005). The threshold the Petitioner must meet to obtain an evidentiary hearing is considered to be "reasonably low." Id. at 546. In considering a motion to vacate a defendant's sentence, the "district court must 'accept the truth of the movant's factual allegations unless they are clearly frivolous on the basis of the existing record.'" Johnson v. United States, 294 F. App'x 709, 710 (3d Cir. 2008) (quoting Booth, 432 F.3d at 545-36).  The district court, however, without further investigation may dispose of "vague and conclusory allegations contained in a § 2255 petition." Id.

## IV. Discussion

### A. Due process violations

Bonfilio argues that the government violated her due process rights by failing to disclose that the government had agreed to seek a reduction in Kitay's sentence in exchange for Kitay's cooperation in Bonfilio's trial. Bonfilio additionally argues that the government violated her due process rights by failing to inform her before trial that Wolper, a witness for the government, engaged in misconduct, which could have been used to impeach his testimony on cross-examination.

To establish that the prosecution's suppression of evidence constituted a due process violation under Brady, "a defendant must show: (1) evidence was suppressed; (2) the suppressed evidence was favorable to the defense; and (3) the suppressed evidence was material either to guilt or to punishment." United States v. Pelullo, 399 F.3d 197, 209 (3d Cir. 2005) (quoting

United States v. Dixon, 132 F.3d 192, 199 (5th Cir. 1997)). Evidence is material if there is a "reasonable probability" that, had the evidence been disclosed to the defense, the result of the underlying proceeding would have been different. Strickler v. Greene, 527 U.S. 263, 280 (1999) (citing United States v. Bagley, 473 U.S. 667, 682 (1985)). Establishing materiality does not require a showing by a preponderance of the evidence that the suppressed evidence would have resulted in acquittal. Kyles v. Whitley, 514 U.S. 419, 433 (1995). Materiality is determined by viewing the cumulative effect of the evidence instead of considering the value of each individual piece of evidence in isolation. Id. at 436-37.

In Brady, the Supreme Court decided its first case in a long line of precedent that considered a prosecutor's duty to disclose evidence during the discovery phase of a criminal trial. Brady, 373 U.S. at 87. The Court in Brady held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of good faith or bad faith of the prosecution." Id. The holding in Brady that requires prosecutors to disclose exculpatory evidence favorable to the accused extends to impeachment evidence. Giglio v. United States, 405 U.S. 150, 153-54 (1972). In later cases, the Court held that a prosecutor has a duty to disclose potential exculpatory or impeachment evidence favorable to the accused even when there is no request by the defendant. United States v. Agurs, 427 U.S. 97, 106-07 (1976); Bagley, 473 U.S. at 682 (stating suppression of Brady/Giglio material may occur regardless of whether the defendant makes a "specific-request" and "general or no-request" for favorable evidence). The Court subsequently held that "a defendant's failure to request favorable evidence did not leave the Government free of all obligation," and a Brady violation might arise "where the Government failed to volunteer exculpatory evidence never requested, or requested only in a general way."

Kyles, 514 U.S. at 433. Due process requires that the prosecution produce all "exculpatory" evidence, which includes both "[m]aterials…that go to the heart of the defendant's guilt or innocence and materials that might affect the jury's judgment of the credibility of a crucial prosecution witness." United States v. Ramos, 27 F.3d 65, 68 (3d Cir. 1994) (quoting United States v. Hill, 976 F.2d 132, 134–35 (3d Cir. 1992)).

The requirement that the prosecution disclose such evidence extends not only to information that is actually known to the prosecutors, but also to "all information in the possession of the prosecutor's office, the police, and others acting on behalf of the prosecution." Wilson v. Beard, 589 F.3d 651, 659 (3d Cir. 2009) (citing Youngblood v. West Virginia, 547 U.S. 867, 869–70 (2006)). A prosecutor has a duty to investigate and is responsible for discovering and disclosing evidence in the possession of each person working on the prosecutor's team. Id. at 421. Knowledge or evidence in the possession of a prosecutor's team is imputed to the prosecutor. Id. Prosecutors are responsible for information known to other lawyers working on their case because "procedures and regulations can be established to carry [the prosecution's] burden and to insure communication of all relevant information on each case to every lawyer who deals with it." Giglio, 405 U.S. at 154 ("The prosecutor's office is an entity and as such it is the spokesman for the Government. A promise made by one attorney must be attributed, for these purposes, to the Government."). Thus, a prosecutor's duty extends beyond their personal, actual knowledge to information that the prosecutor "should have known." Agurs, 427 U.S. at 103.

### 1. Kitay's alleged agreement with the government

Bonfilio argues that an agreement existed at the time of her trial between the government and Kitay, and that the government failed to disclose this information to Bonfilio prior to her

trial. She argues that Kitay's testimony served as the lynchpin in the government's case, and that absent credible evidence from Kitay the government would have been unable to prove that Bonfilio devised and managed a fraudulent scheme.

### a. Relevant Factual Background

Prior to the onset of this case, Kitay was Bonfilio's partner in life and business. Because Kitay had good credit, Bonfilio influenced Kitay to use her signature on many of the fraudulent documents at issue in this case. Kitay was charged for her misconduct, and she pleaded guilty before this court in advance of Bonfilio's trial. (Crim. No. 09-172, ECF No. 48; Crim. No. 10-230, ECF No. 5.) Kitay was sentenced to an 18-month term of imprisonment, followed by a 3-year term of supervised release, with $1,229,000 owed in restitution. (Crim. No. 09-172, ECF No. 80; Crim. No. 10-230, ECF No. 22.)

While serving her sentence at a medical facility in Texas, Kitay was transferred to Pittsburgh, Pennsylvania in order for her to testify in the trial against Bonfilio. (ECF No. 164 at 5–6, 95.) Kitay did so at length, and the jury convicted Bonfilio of the crimes listed above. At trial, the government and Kitay engaged in the following exchange during her direct examination:

| PROSECUTOR. | You told us that you are currently serving a jail sentence. What is that sentence? |
|---|---|
| KITAY. | Eighteen months. |
| PROSECUTOR. | What led up to that sentence being imposed? |
| KITAY. | I pled guilty to my charges of wire fraud and failure to file tax returns. |
| PROSECUTOR. | When you pleaded guilty, Ms. Kitay, was there any sort of an agreement that was entered into with the government? |

| | |
|---|---|
| KITAY. | Yes.  Part of the agreement was that I was not going to be testifying. |
| PROSECUTOR. | So, you did have a plea agreement, but there was – the agreement did not  require you to      testify? |
| KITAY. | That's correct. |
| . . . . | |
| PROSECUTOR. | In connection with your testimony here that is now occurring, has there   been  any  promise  made  [by  the government]? |
| KITAY. | No. |
| PROSECUTOR. | Any sort of agreement? |
| KITAY. | No. |
| PROSECUTOR. | The only agreement you have is this plea agreement? |
| KITAY. | Yes. |

(Id. at 5–6.) Bonfilio's trial counsel did not cross-examine Kitay on any alleged agreement she may have had with the government for a reduction in her sentence in exchange for her testimony against Bonfilio.

After Bonfilio's trial, the government filed a motion under Federal Rule of Criminal Procedure 35(b) requesting a reduction in Kitay's sentence based upon her cooperation in testifying against Bonfilio.  (Misc. No. 12-369, ECF Nos. 1, 2.)  The court granted that motion and reduced her sentence to time served.  (Misc. No. 12-369, ECF Nos. 3; Crim. No. 09-172, ECF No. 85; Crim. No. 10-230, ECF No. 26.)   During the hearing on this motion, the government's counsel stated:

> Kitay pleaded guilty.  She never quibbled over her guilt.  She admitted what she had done, and she accepted her fate when she appeared before Your Honor, without seeking any benefit, without proffering more than an apology.

When we later, independently of her guilty plea, asked if she would testify at the Bonfilio trial, she did not ask what she might gain by doing that, but only what we needed to know.[6]

During this hearing, Kitay's counsel, William Schmalzried ("Schmalzried"), stated:

I concur with everything [the government] has said . . . . [Kitay] never asked me about anything either about what, what is in it for me [for testifying against Bonfilio]. She did not ask me about that . . . . [S]he never brought that up with me . . . . It never really came up.

In her § 2255 motion, Bonfilio asserts that before her trial, the government agreed to reduce Kitay's sentence if Kitay testified against Bonfilio at trial. Bonfilio alleges (1) that the government's failure to disclose this agreement to her before trial violated Brady and (2) that the government's failure to correct Kitay's allegedly false testimony during trial denying the agreement violated *Napue*. For the reasons set forth below, Bonfilio's contentions are without merit. This issue can be resolved without an evidentiary hearing because the testimony Bonfilio relies upon is inadmissible hearsay and the record contradicts her claims.

### b. Discussion

Aside from bare assertions, the only evidence Bonfilio adduced to support her claim that Kitay had an agreement with the government is the affidavit of James. R. Ramsey ("Ramsey"), a private investigator retained by Bonfilio, who avowed:

On Tuesday, June [23, 2015] . . . , I telephonically contacted Mr. William Schmalzried . . . . I asked if he represented Deborah Kitay on the day of the trial and he responded that" [*sic*] he did represent [Kitay] until she was released." I asked Mr. Schmalzried, "if Deborah Kitay knew that her sentence was going to be

---

[6] These statements are taken from the previously-sealed transcript for the Rule 35(b) motion hearing that took place on October 19, 2012. *See* (Misc. No. 12-369, ECF No. 3.) This transcript is now unsealed. (Crim. No. 09-172, ECF No. 89, 90; Crim. No. 10-230, ECF No. 31.) The court may take judicial notice of this transcript. "[I]t is well established that courts are permitted to consider matters of which they may take judicial notice, including . . . transcripts from judicial proceedings 'in related or underlying cases which have a direct relation to the matters at issue.'" Golden v. Cook, 293 F. Supp. 2d 546, 551 (W.D. Pa. 2003).

> reduced if she testified against Denise Bonfilio and *he said that she knew her sentence was going to be reduced* and the sentence was reduced". [*sic*]

(ECF No. 249-4 at 2.) (emphasis added) Ramsey's affidavit recounting Schmalzried's alleged out-of-court statements are, however, inadmissible hearsay not within any exception. FED. R. EVID. 801(c), 802. This court must, therefore, determine whether it can rely on inadmissible hearsay to support Bonfilio's contention that the government suppressed material information about Kitay's alleged agreement with the government.

The Fifth Circuit Court of Appeals faced a nearly identical question in Goodwin v. Johnson, 132 F.3d 162, 185 (5th Cir. 1997), as the issue Bonfilio presents here. Like Bonfilio, the petitioner in Goodwin claimed that one of the witnesses at his trial entered into an agreement with the government, whereby the witness would testify at Goodwin's trial in exchange for a reduced sentence. Goodwin, 132 F.3d at 185. Also like Bonfilio, Goodwin claimed that the witness lied about the existence of such an agreement during petitioner's trial. Id. As evidence of the witness's false testimony Goodwin provided an affidavit from the witness's ex-wife, in which she averred that prior to testifying at Goodwin's trial her husband told her that he had entered into an agreement with the government whereby he would testify in exchange for a reduced sentence. Id. In determining whether this evidence entitled Goodwin to a § 2255 hearing, the Fifth Circuit Court of Appeals stated:

> [Affiant's] alleged statement is hearsay, as it is an out-of-court statement offered to prove the truth of the matter asserted. Because Goodwin has not demonstrated that [the witness's] alleged statement to [affiant] fits any exception to the general rule that hearsay is inadmissible, the statement is incompetent summary judgment evidence. None of the other summary judgment evidence presented to the district court, including the affidavits of the prosecuting attorneys and the numerous affidavits of [the witness], contradict [the witness's] trial testimony that the state had offered him no deal in exchange for his testimony as of the time that his sentence . . . was imposed. Because Goodwin has failed to demonstrate the

existence of a fact issue as to the falsehood of [the witness's] testimony at trial, he is not entitled to an evidentiary hearing on this issue.

Id. at 186 (citations omitted).

Like in Goodwin, this court must decide whether a hearsay statement alleging that a witness lied about the existence of an agreement with the government entitles petitioner to an evidentiary hearing. While the Third Circuit Court of Appeals has not addressed whether a court can or should consider otherwise unsubstantiated hearsay evidence in a petitioner's motion for a § 2255 hearing, several other circuit courts of appeal have held that "'hearsay statements will not normally entitle the applicant to a [§ 2255] hearing, since such hearsay would be inadmissible at the hearing itself.'" LoCascio v. United States, 395 F.3d 51, 57 (2d Cir. 2005) (quoting Dalli v. United States, 491 F.2d 758, 760 (2d Cir. 1974))[7]; United States v. Lowe, 6 F. App'x 832, 837 n.

---

[7] In LoCascio, the petitioner, Frank LoCascio ("LoCascio") was charged for his involvement in organized crime and was originally tried alongside codefendant, John Gotti ("Gotti"). LoCascio, 395 F.3d at 52–53. In his habeas corpus motion, LoCascio raised an ineffective assistance of counsel claim, alleging that before trial Gotti threatened LoCascio's counsel, Anthony Cardinale ("Cardinale"), and that these threats adversely affected Cardinale's performance. Id. at 53–54. In support of this allegation, LoCascio provided an affidavit from an attorney whom Cardinale told about these threats. Id. Despite recognizing that Cardinale's statements were hearsay and that hearsay typically will not entitle a petitioner to a § 2255 hearing, the Court of Appeals for the Second Circuit decided to grant an evidentiary hearing based on the hearsay allegations. Id. at 57. The court determined that a hearing was proper even though the attorney's statement was hearsay, inter alia, because the court was "assured by an officer of the court that [Cardinale] has made the statements claimed and will provide testimonial evidence in support." Id. Because it was represented that Cardinale would testify at the hearing, the court had reason to believe that LoCascio would be able to establish the hearsay statements "by competent evidence," i.e. admissible evidence. Id.

Other courts have adopted this standard, holding that "[t]he initial presentation can be, as in ordinary summary judgment cases, in affidavit form, so long as it is evident that from the face of what is presented it can be reduced to admissible form at an evidentiary hearing." Bowe v. United States, Civ. Action No. 404-308, 2009 WL 2899107, at *9 (S.D. Ga. May 20, 2009), aff'd, 426 F. App'x 793 (11th Cir. 2011). Under this approach, a court can consider inadmissible evidence when determining whether a petitioner is entitled to a § 2255 hearing, "so long as the submitting party can also show that he can reduce it to admissible form at trial or at a hearing." Id.; see also Porcaro v. United States, 832 F.2d 208, 212 (1st Cir. 1987) (holding that "[t]here would be no benefit to petitioner in convening an evidentiary hearing if the allegedly favorable"

6 (10th Cir.2001) ("In the event that [petitioner] decides to pursue this issue in a § 2255 motion, we advise him that hearsay affidavits may be disregarded."); Goodwin, 132 F.3d at 186 (holding hat a hearsay affidavit did not entitle habeas petitioner to an evidentiary hearing); Porcaro v. United States, 832 F.2d 208, 212 (1st Cir.1987) (holding that, absent the proffer of competent, non-hearsay affidavits an evidentiary hearing pursuant to § 2255 was unnecessary); Johnson v. United States, 239 F.2d 698, 699 (6 Cir. 1956) ("[Petitioner] presents only 'incredible hearsay statements' not requiring to be dignified by a hearing"); *see also* 30 Kenneth W. Graham, Jr. and , Michael H. Graham, Federal Practice and Procedure § 6334 (1st ed. 2016) ("[I]n cases where the Advisory Committee has specifically said that the absence of an exemption in Rule 1101 is intended to make the Evidence Rules applicable, courts have held hearsay is inadmissible despite a prior practice of allowing its use; e.g., in habeas-corpus proceedings.").

Courts have held that because "[a] 28 U.S.C.A. [§] 2255 proceeding for challenging collaterally the validity of a federal conviction is . . . a formal procedure with all of the usual accouterments of a civil trial . . . . The issues of fact will be resolved under the Federal Rules of Evidence, Rule 1101(e)." United States v. Francischine, 512 F.2d 827, 829 (5th Cir. 1975)). Requiring that the evidence courts use to determine whether an evidentiary hearing is necessary be admissible at the evidentiary hearing itself protects the integrity of such hearings, as "[a] standard that would entitle a petitioner, based solely on hearsay information . . . to a full

---

evidence could not be presented at the hearing). Bonfilio neither asserted nor demonstrated that she can reduce the inadmissible hearsay in Ramsey's affidavit to an admissible form at trial. It is noteworthy that Schmalzried made statements on the record during Kitay's Rule 35(b) hearing, which directly contradict the statements he allegedly made to Ramsey. (ECF No. 249-4; Crim. No. 09-172, ECF Nos. 89, 90.) Bonfilio's case is, therefore, distinguishable from LoCascio, because unlike the petitioner and affiant in LoCascio, Bonfilio provided no assurances that Schmalzried will provide testimonial evidence in support of her claim that Kitay entered into an agreement with the government prior to testifying at Bonfilio's trial.

evidentiary hearing . . . would too easily lend itself to abuse, because such hearsay is too easily manufactured." Hayden v. United States, 814 F.2d 888, 892 (2d Cir. 1987); see also Borden v. Allen, 646 F.3d 785, 810 n. 31 (11th Cir.2011) ("Inherent in the fact pleading requirement of the federal habeas rules is the notion that a habeas case is not a vehicle for a so-called fishing expedition via discovery, an effort to find evidence to support a claim.")

In determining whether the court will consider the evidence Bonfilio provided about Kitay's agreement with the government, "[t]he appropriate standard to be used . . . is whether, 'if the evidence should be offered at a hearing, it would be admissible proof entitling the petitioner to relief.'" United States ex rel. Jones v. Washington, No. 91 C 20199, 1992 WL 70334, at *5 (N.D. Ill. Mar. 30, 1992), aff'd sub nom. Jones v. Washington, 15 F.3d 671 (7th Cir. 1994) (quoting Hayden, 814 F.2d at 892). Because Schmalzried's alleged out-of-court statements are inadmissible hearsay, which would not be admissible at the evidentiary hearing, the court need not consider this hearsay evidence in determining whether Bonfilio is entitled to a § 2255 hearing.

Without Ramsey's affidavit, the court is left only with Bonfilio's bare assertion that Kitay had a deal with the government. That assertion is, however, baseless in light of (1) the testimony Kitay offered at trial denying the existence of a deal before trial, and (2) the statements made on the record by the government's counsel and Kitay's counsel at the October 19, 2012 hearing on Kitay's Rule 35(b) motion which belie the existence of a deal. The court must "'accept the truth of [Bonfilio's] factual allegations,'" but it may ignore factual allegations that are "'clearly frivolous on the basis of the existing record.'" United States v. Tolliver, 800 F.3d 138, 141 (3d Cir. 2015) (quoting Booth, 432 F.3d at 546). Because there is no admissible testimony to support

Bonfilio's allegation and the record contradicts her allegation about Kitay's alleged agreement with the government, relief is not warranted on this ground under § 2255.

## 2. Wolper's misconduct

At trial Wolper testified about his involvement with 521 Chestnut Street, a property subject to Counts 3 and 5 of the Indictment. Following Bonfilio's trial, the government disclosed several documents to Bonfilio concerning criminal and other misconduct of Wolper [hereinafter "Wolper materials"]. Though the government was in possession of this information prior to Petitioner's trial and the lead attorney for the government, Brendan Conway ("Conway"), participated in several of the interviews included in the Wolper material (ECF No. 265-5 at 4, 13, 22), the U.S. Attorney's office did not disclose this information to Bonfilio prior to her trial. The government argues it had no duty to disclose the Wolper materials, as the information they contained was unsubstantiated at the time of Bonfilio's trial. The government argues that this information was not material to Bonfilio's case, because Wolper's testimony was only of minimal importance and was supported by the testimony of other witnesses.

Bonfilio asserts that the Wolper materials were exculpatory and material, and that the government had a duty to disclose them under Brady. In particular, Bonfilio argues that these documents should have been disclosed to her on two grounds: 1) they include material that defense counsel could have used to impeach Wolper during his testimony, and 2) they include information about Wolper's business practices, namely his ownership of certain companies and his relationship with several appraisers, which Bonfilio could have used to undermine the government's claim that she was responsible for inflated appraisals.

### a. Relevant Background Information

At Bonfilio's trial, Wolper testified as a witness for the government. (ECF No. 170 at 4–42.) He testified about his involvement in the investment real estate business. Of particular relevance to the government's case against Bonfilio, Wolper testified that he loaned Bonfilio money to complete renovations at 521 Chestnut Street. (Id. at 5–8.) At a later time, and in a matter unrelated to Wolper, Bonfilio acquired an inflated appraisal on this property. (ECF No. 168 at 141–160; ECF No. 232 at 149.) This appraisal falsely represented that renovations had been completed on 521 Chestnut Street. (ECF No. 181 at 34–38; ECF No. 232 at 149.) Bonfilio later secured a refinance loan collateralized by 521 Chestnut Street. (Id. at 16.) The loan package presented to the lender contained, *inter alia*, the inflated appraisal. (Id. at 144.) On November 3, 2006, the lender wired Bonfilio funds based on this fraudulent loan package. (ECF No. 1 at 5.) This wire fraud is the subject of Count 5 of the Indictment. (Id.)

Though Wolper did not testify about the appraisal or the refinancing of 521 Chestnut Street, he did testify that he purchased this property several years later. (ECF No. 170 at 21.) Wolper testified that at the time he purchased the property renovations had not been completed. (Id.) This testimony related to Count 5 of the indictment and it demonstrated that the appraisal of 521 Chestnut Street, which induced the bank to wire Bonfilio the funds subject to Count 5 of the Indictment, was based on fraudulent information.

On January 26, 2016 – three years after Bonfilio was convicted – the government initiated a criminal case against Wolper for his involvement in mortgage fraud. (2:16-cr-00007, ECF No. 1.) On March 7, 2016, Wolper pleaded guilty to Count 1 of an information. (2:16-cr-00007, ECF No. 8.) While the government was in possession of material that was incriminating to Wolper prior to Bonfilio's trial, the government failed to disclose any of this information to Bonfilio prior to trial. (ECF No. 266-2.) On October 19, 2015 – again, after Bonfilio had already

been convicted – the government sent Bonfilio a letter containing the incriminating materials. (Id.)

The nondisclosed evidence contained in the "Wolper materials" included information about Wolper's involvement in two mortgage fraud schemes. The first scheme involved loans closed by Wolper's company, Citizens Settlement Services ("CSS"). (ECF No. 266-5.) The information disclosed to Bonfilio included interviews showing Wolper may have been involved in illegal dealings. While two of the individuals interviewed implied that Wolper was involved in those illegal dealings, two other interviewees indicated that Wolper was not a knowing participant in this fraud. (Id.) The government asserts that at the time of Bonfilio's trial, it had contradictory information with respect to Wolper's involvement in these activities and had not developed sufficient evidence to charge him in connection with this investigation. (ECF No. 268 at 4–5.)

The second scheme involved a mortgage broker business called Lender's Corner, which worked with CSS. In May 2009, the government received an anonymous letter alleging that Wolper was paying Lender's Corner for referring closing business to CSS. (ECF 266-6 at 14–15.) Another individual, Michelle Barone ("Barone"), made similar allegations during an interview with the government. (ECF 266-7.) The anonymous letter and the Barone interview pre-dated Bonfilio's trial. The government stated, however, that other interviews conducted prior to Bonfilio's trial did not corroborate these statements or reveal how these closings were fraudulent. (ECF No. 268 at 5.) Accordingly, the government asserts that at the time of Bonfilio's trial, the allegations connecting Wolper to Lender's Corner remained unsubstantiated. (Id.)

18

The government claims that only subsequent to Bonfilio's trial did it develop sufficient information to bring criminal charges against Wolper. According to the letter the government sent to Bonfilio on October 19, 2015, the government was able to substantiate claims against Wolper through materials uncovered on the hard drive belonging to Wolper's business associate, Howard Reck. (ECF No. 266-2.) The government alleges that it had access to this hard drive on or about January 4, 2011, but that information implicating Wolper was not uncovered until a "recent analysis." (Id.) The October 19th letter does not state when this analysis took place. (Id.) The government avers that the Federal Bureau of Investigation and the Criminal Investigation Division of the Internal Revenue Services, the agencies that investigated Petitioner's case, were not in possession of this hard drive; rather it was in the possession of the United States Secret Service. (Id.) The interviews contained within the Wolper materials, however, indicate that Conway, the lead U.S. attorney in Bonfilio's case, participated in at least three of the interviews in which Wolper was implicated. (ECF No. 266-5 at 4, 13, 22.) Additionally, the government does not disclose when the information on this hard drive was shared with the agencies that investigated Bonfilio's case, and whether this disclosure occurred before or after Bonfilio's trial. (ECF No. 266-2.)

### b. Duty to disclose "unsubstantiated" information

The court must determine whether the government violated its constitutional duty to disclose evidence that is material to a defendant's guilt or punishment. Brady, 373 U.S. at 87. Under Brady v. Maryland and its progeny, the government must disclose to the defense evidence that is both exculpatory and material. As the Court of Appeals for the Third Circuit explained in United States v. Higgs:

> In <u>Brady v. Maryland</u> ... the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.". . . . That rule has been expanded to require that, even though a defendant has not made a specific request for exculpatory material, the prosecutor is under a duty to volunteer evidence "obviously of such substantial value to the defense that elementary fairness requires it to be disclosed."

713 F.2d 39, 41–42 (1983) (citations omitted).

Courts have placed certain limitations on the materials the government must produce. "[T]he government is not obliged under <u>Brady</u> to furnish a defendant with information which he already has or, with any reasonable diligence, he can obtain himself." <u>United States v. Prior</u>, 546 F.2d 1254, 1259 (5th Cir. 1977); <u>Wright v. Hopper</u>, 169 F.3d 695, 702 (11th Cir. 1999), <u>cert. denied</u>, 528 U.S. 934 (1999) ("The prosecution is not required to furnish a defendant with exculpatory evidence that is fully available to him through the exercise of due diligence."); <u>United States v. Dean</u>, 722 F.2d 92, 95 (5th Cir. 1983) ("*Brady* rights are not denied where the information was fully available to the defendant and his reason for not obtaining and presenting such information was his lack of reasonable diligence."); 2 Charles Alan Wright, Andrew D. Leipold, Peter J. Henning, & Sarah N. Welling, Federal Practice and Procedure § 256 (4th ed. 2016) ("Evidence equally available to the defendant by the exercise of due diligence means that the government is not obligated under Brady to produce it.")

Additionally, "[i]n the absence of a particularized and focused request, the district court is not required to troll through voluminous recordings in search of potentially exculpatory evidence." <u>United States v. Caro-Muniz</u>, 406 F.3d 22, 30 (1st Cir. 2005); <u>Pelullo</u>, 399 F.3d at 217 n.21 (quoting <u>United States v. Meros</u>, 866 F.2d 1304 (11th Cir.1989)) ("[a] prosecutor has no duty to undertake a fishing expedition in other jurisdictions in an effort to find potentially

impeaching evidence every time a criminal defendant makes a *Brady* request for information regarding a government witness."); United States v. Beech, 307 F.R.D. 437, 441 (W.D. Pa. 2015) (the government's obligation under Brady "is not to be used . . . to permit a defendant to obtain wholesale discovery of the government's principal case.").

The government does not argue that the information in the Wolper materials was not favorable to Bonfilio; rather, the government argues that it had no duty to disclose these materials, because at the time of Bonfilio's trial the allegations against Wolper were unsubstantiated. The government's argument that it is not required to disclose unsubstantiated allegations against a government witness is compelling. See Agurs, 427 U.S. at 110 n.16 (commenting that the prosecution has no "obligation to communicate preliminary, challenged, or speculative information.").

The government cites two court of appeals' decisions in which the government was not required to disclose unsubstantiated allegations. In United States v. Souffront, the defendant learned for the first time at sentencing that one of the police officers who searched his apartment and testified at his trial was the subject of an active, ongoing criminal investigation. 338 F.3d 809, 817 (7th Cir. 2003). The defendant argued that, had the government disclosed this information, he could have used it to quash the search warrant the officer signed. Id. at 822. In determining the validity of defendant's argument, the court recognized that the government attorney in the case knew that there were unsubstantiated allegations against several officers in the department, but did not know there was a direct investigation of the officer in question. The court held that the government did not have to disclose the information about the investigation into this officer because, *inter alia*, "[t]he failure to disclose untrustworthy and unsubstantiated allegations against a government witness is not a *Brady* violation." Id. at 822.

In United States v. Diaz, the defendant learned after sentencing that a government informant who testified in his case had stolen $18,000 from the government and that the government had suspected the informant of this theft prior to defendant's trial. 922 F.2d 998, 1006 (2d Cir. 1990). Defendant contended that the government's failure to disclose this information violated his rights under Brady. Id. The district court determined that the government did not have to communicate this information, not only because this information was not material and was repetitive of other evidence presented at trial, but also because the government only had "suspicions" of the theft as opposed to "knowledge" of the theft. The Second Circuit Court of Appeals upheld this decision, finding that it was not clearly erroneous. Id. at 1007–08.

These decisions suggest that when the government is in receipt of information that is favorable to the defendant, but is "untrustworthy and unsubstantiated" or is based solely on suspicion rather than knowledge, the government need not disclose this information to defendant. While this court recognizes the sound reasoning of Souffront and Diaz, it is also cognizant that the government's duty to disclose exculpatory evidence is a constitutional imperative that cannot be disregarded. Brady v. Maryland, 373 U.S. at 87; Higgs, 713 F.2d at 41–42. The court finds the First Circuit Court of Appeal's decision in United States v. Bulger, 816 F.3d 137 (1st Cir. 2016), particularly instructive on this matter.

In Bulger, the government received an anonymous letter alleging that the police officer in charge of handling one of the government witnesses was engaged in unlawful activity. The government completed an extensive investigation and determined that these allegations were unfounded. Bulger, 816 F.3d at 151. The government shared these findings with the court, which granted a protective order preventing anyone from viewing the anonymous letter. Id. The

defendant later sought access to the letter and the investigative material. The trial court denied this request, holding that the government was not required to turn over these materials because they "were determined to be not just unsubstantiated . . . but, quote, false and not factual." Id. at 152. The First Circuit Court of Appeals determined that the trial court did not "abuse[] its discretion in holding that Bulger was not entitled to the ex parte materials under Brady or Giglio (or any of their progeny)," as the allegations in the letter "were disproven and allowing [defendant] to rummage through the ex parte materials would have been just the type of fishing exhibition that our jurisprudence does not contemplate." Id. at 154–55.

The First Circuit Court of Appeals, however, clarified the limited nature of the holding:

> To be clear, our conclusion today by no means suggests that the government can sidestep its *Brady* obligations simply by conducting its own investigation and determining that potentially discoverable allegations are unsubstantiated. Our holding is limited to the facts of this case. Here, the court conducted an in camera review of a significant amount of ex parte materials, following a comprehensive internal State Police investigation . . . . Based on these, the court concluded, and our review confirmed, that not only were the allegations dubious and unsupported but they were false and not factual. Given all this . . . we cannot find that the court's *Brady* ruling was an abuse of discretion.

Id. at 155.

In Bonfilio's case, the government claims to have made an internal assessment that the information regarding Wolper's misconduct was neither substantiated nor reliably truthful, and that as a result of this determination it was not required to disclose this information to Bonfilio. The evidence against Wolper, however, did not consist of mere suspicions like in Diaz. Nor is this case like Souffront, as here the lead attorney for the government, participated in several of the interviews included in the Wolper materials and was, therefore, aware of the allegations against Wolper (ECF No. 265-5 at 4, 13, 22). Finally, unlike the allegations at issue in Bulger, which were found to be untrue, here the allegations against Wolper were accurate.

Had the government presented the Wolper materials for *in camera* review, this court could have determined whether the information they contained was favorable and material to Bonfilio's case. The court, however, fears that in this case, the government may have fallen into the trap outlined in <u>Bulger</u>, whereby the government determined that it could "sidestep its *Brady* obligations simply by conducting its own investigation and determining that potentially discoverable allegations are unsubstantiated." <u>Bulger</u>, 816 F.3d at 155. Absent a more thorough review of all the potentially incriminating materials the government had with respect to Wolper, this court cannot determine whether the allegations against Wolper were, in fact, unsubstantiated when the government chose not to disclose them to Bonfilio. While the court cannot make this factual determination based solely on the record before it, the court does not need to decide this matter, as petitioner did not show that the information within the Wolper materials was material to her case.

### c. Materiality

Having determined that the court as this stage of the proceedings cannot conclude that the government could avoid its duty under <u>Brady</u> by categorically determining that the allegations against Wolper were "unsubstantiated," the court will now look at the information Bonfilio asserts was material to her case. Bonfilio asserts that the documents the government failed to disclose included two material pieces of information – Wolper's misconduct and Wolper's business connections. For each of these pieces of information that court must determine whether the government had a duty to disclose information of this sort to Bonfilio and, if so, whether this undisclosed information was material.

### i. Wolper's Misconduct

It is undeniable that the government has a duty to disclose impeachment evidence favorable to the accused. Giglio, 405 U.S. at 153-54; Agurs, 427 U.S. 97, 106-07 (1976). Had Bonfilio known about Wolper's fraudulent schemes prior to trial she could have used this information to impeach his testimony. There is no doubt, therefore, that the allegations against Wolper contained in the undisclosed materials were favorable to Bonfilio.

Petitioner, however, must also demonstrate that this information was material to her case. Evidence is material if there is a "reasonable probability" that, had the evidence been disclosed to the defense, the result of the underlying proceeding would have been different. Strickler v. Greene, 527 U.S. 263, 280 (1999) (citing United States v. Bagley, 473 U.S. 667, 682 (1985)). The government contends that the only piece of Wolper's testimony that was relevant to Bonfilio's case was Wolper's confirmation that the renovations at 521 Chestnut Street were not completed; his testimony showed that the wire transfer related to 521 Chestnut Street was based on a falsified appraisal. (ECF No. 268 at 7–8.) The government argues, however, that this testimony was not material to Bonfilio's case, because the relevant information Wolper provided pertained to only one of nine counts against Bonfilio and was confirmed by other witnesses.[8] (Id.)

Bonfilio, for her part, does not show how the impeachment information would have altered the result of her trial. She merely states that, had the government provided her with

---

[8] Several other witnesses testified that the appraisal of 521 Chestnut Street was inaccurate. Like Wolper, Berger testified that construction was not completed on 521 Chestnut Street. (ECF No. 181 at 34–38; ECF No. 232 at 146–149.) David Barone, an appraiser who testified as an expert witness for the government, testified at length about the inaccuracies and faulty comparisons within the 521 Chestnut Street appraisal. (ECF No. 168.) Kitay testified that Bonfilio would engage in certain practices to get higher appraisals, including taking appraisers to view houses that she wanted the appraiser to use as comparable, even before Bonfilio finished building the home to be appraised . (ECF No. 164 at 5.)

information about Wolper's misconduct prior to trial, Wolper would not have been allowed to testify as a "law-abiding businessman." (ECF No. 269 at 2.) While this may be true, Bonfilio does not demonstrate how the outcome of her trial would have been different had the government disclosed the Wolper materials to her prior to trial. Given the limited importance of Wolper's testimony, the fact that the relevant portions of his testimony were corroborated elsewhere on the record, and the overwhelming nature of the evidence presented against Bonfilio at trial (see discussion supra Section II, at 2–3), Bonfilio did not show that the information the government possessed with respect to Wolper's criminal conduct was material to her case.

### ii. Wolper's business connections

Bonfilio argues that the Wolper materials contained material information with respect to Wolper's business dealings, namely that Wolper was an owner of CSS and Citizens Appraisals. Bonfilio claims that this information is relevant because several of the appraisers in her case worked for both companies. She asserts that had she known this at the time of trial she could have shown that there was "an ongoing vast conspiracy perpetrated by Mr. Berger and Mr. Wolper and their minions," (ECF No. 269 at 4) and that Berger and Wolper, rather than Bonfilio, were responsible for the inflated appraisals. Bonfilio contends that there is a reasonable probability that her proceedings would have resulted in a different outcome had she shown at trial that Berger and Wolper were the individuals responsible for the inflated appraisals, as the question of who was responsible for these appraisals is fundamental to the government's case.

Bonfilio's argument is without merit. First, information with respect to Wolper's ownership of CSS is publically available. "[T]he government is not obliged under Brady to furnish a defendant with information which he already has or, with any reasonable diligence, he

can obtain himself." <u>United States v. Prior</u>, 546 F.2d 1254, 1259 (5th Cir. 1977). Bonfilio did not show that the information about Wolper's business was unavailable to her. Information which she could have attained through due diligence does not become <u>Brady</u> material simply because it can be found in a report containing impeachment information.

Second, under <u>Brady</u> the government must "volunteer evidence 'obviously of such substantial value to the defense that elementary fairness requires it to be disclosed,'" 713 F.2d 39, 41–42 (1983); however, there is no duty "[i]n the absence of a particularized and focused request . . . to troll through voluminous recordings in search of potentially exculpatory evidence." <u>Caro-Muniz</u>, 406 F.3d at 30. Here, Bonfilio made no particularized and focused request with respect to Wolper's business activities. The government need not envision every potential theory a petitioner might raise, and then search through its materials in order to produce information that might support this theory. Had Bonfilio made a "particularized and focused request" it is possible the Wolper materials would have been discoverable under <u>Brady</u>, but here Bonfilio made no such request and it is not clear that the information about Wolper's activities was of an obvious and substantial value, such that the burden was on the government to produce these materials even in the absence of such a request. The court, therefore, cannot support Bonfilio's conclusion that the government had a duty under <u>Brady</u> to disclose information about Wolper's business dealings.

Finally, Bonfilio did not show that the information regarding Wolper's business connections, even if true and discoverable under <u>Brady</u>, was material to her case. Bonfilio claimed that Wolper's ownership of CSS and Citizens Appraisal shows a close, ongoing, and illicit connection between many of the individuals involved in her case, including Wolper, Berger, Howard Reck, Joel Reck, Craig Tengowski, and Larry Veazey. Bonfilio, however,

provided no evidence to support her allegation that these individuals were involved in "an ongoing vast conspiracy" beyond the singular piece of information that Wolper owned two companies and these two companies employed several of these individuals. The logical leap Bonfilio's argument requires – namely that Wolper's ownership of two companies reveals the existence of a large scale conspiracy against her – is unsupported by the evidence. Bonfilio's argument that a network of other individuals conspired against her is "clearly frivolous on the basis of the existing record." Tolliver, 800 F.3d at 141. The evidence presented at trial overwhelmingly showed that Bonfilio planned and carried out substantial fraudulent activity. (See discussion supra Section II, at 2–3.) As such, Bonfilio establishes no right to relief on this basis.

### B. Prosecutorial misconduct

Federal habeas relief may be granted when a prosecutor's conduct "so infect[s] the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974); see Foy v. Lamas, Crim. No. 12-088, 2013 WL 838191, at *28 (E.D. Pa. Mar. 6, 2013); Pursell v. Horn, 187 F.Supp.2d 260, 341 (W.D. Pa. 2002). To satisfy this standard, the prosecutor's misconduct must constitute a "'failure to observe the fundamental fairness essential to the very concept of justice.'" Donnelly, 416 U.S. 642 (quoting Lisenba v. California, 314 U.S. 219, 236 (1941)). The court must "examine the prosecutor's offensive actions in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." Moore v. Morton, 255 F.3d 95, 107 (3d Cir. 2001); see United States v. Young, 470 U.S. 1, 11 (1985).

Bonfilio contends that the government violated her due process rights when, during a recess at trial, then-counsel for the government, James Garrett ("Garrett") allegedly assaulted then-counsel for Bonfilio, Steven Misko ("Misko" or "Counsel"). Bonfilio alleges that during the recess and outside the view of judge and jury, Garrett "jumped up, ran to Mr. Misko, who's back was turned (collecting papers at the podium) and [] aggressively grabbed Mr. Misko's shoulder, swung him around and he began to scream at him while poking him with his finger." (ECF No. 249 at 12.) According to Bonfilio, this action so shocked and distracted Misko that when the court resumed following the recess, Misko did not return to the line of questioning in which he had previously been engaged. Petitioner argues that Misko's failure to pursue this line of questioning following the recess was prejudicial to her case.

The court must accept as true that an altercation took place between counsel for the government and counsel for defendant. Even accepting this factual allegation as true, there is no evidence in the record to support Bonfilio's conclusory assertion that she suffered prejudice as a result. Aside from bare assertions and speculation, Bonfilio provided no evidence to support her claim that the altercation affected Misko's legal strategy. In support of her claim, Bonfilio cites to the affidavit from Ramsey discussed earlier. In this affidavit Ramsey, who witnessed the alleged assault between Garrett and Misko, describes the altercation. Ramsey also quotes Schmalzried, another witness to the incident, as well as Misko.

As stated previously, the portions of Ramsey's affidavit that recount alleged out-of-court statements are inadmissible hearsay not within any exception. FED. R. EVID. 801(c), 802. As such, they will not be admissible at an evidentiary hearing, and need not be considered when determining whether Petitioner is entitled to a hearing. The statements from Misko and

Schmalzried contained in Ramsey's affidavit, therefore, will not entitle Bonfilio to a hearing. <u>See</u> <u>LoCascio v. United States</u>, 395 F.3d 51, 57 (2d Cir. 2005).

Even if these statements were to be admitted, they do not support Bonfilio's assertion that Misko was intimidated by counsel for the government. According to Ramsey's affidavit, following the incident Misko remarked that he "must have hit a nerve while questioning the witness." (ECF No. 249-4 at 1.) Allegedly, when Bonfilio told Misko that she wanted to report the assault to the judge, he replied, "I will not report this to the judge and I am not asking for a mistrial. [sic] I have to work with these people in the future." <u>Id</u>. These statements do not support Bonfilio's claim that Misko felt threatened by counsel for the government or that he changed his legal strategies as a result of the altercation. These statements provide little to no insight into how the altercation affected Misko, beyond demonstrating that he had reasons for not reporting the incident to the court other than feeling intimidated, including a desire to maintain a professional relationship with opposing counsel. Aside from Bonfilio's bare assertion with respect to her Counsel's state of mind – an assertion that is unsupported by either admissible or inadmissible evidence – there is no evidence on the record to support Bonfilio's claim that Misko altered his legal strategy as a result of an altercation with government counsel during recess.

Furthermore, Bonfilio provides no evidence that Misko's decision to discontinue his line of questioning following the recess caused her prejudice. Bonfilio did not show that, had Counsel continued with his line of questioning, there was a reasonable probability that the outcome of her case would have been different. <u>Strickler</u>, 527 U.S. at 280; <u>Sistrunk v. Vaughn</u>, 96 F.3d 666, 670 (3d Cir. 1996). Given the overwhelming evidence against her, (<u>see</u> discussion <u>supra</u> Section II, at 2–3), it is highly unlikely Bonfilio could demonstrate that Misko's decision to discontinue his line of questioning with respect to a single witness was prejudicial to her case and her assertions

otherwise are conclusory. Bonfilio, therefore, is not entitled to a § 2255 hearing on the grounds of prosecutorial misconduct.

### C.  Ineffective Assistance of Counsel

To support a claim that Counsel's assistance was so defective as to amount to a deprivation of her Sixth Amendment right to effective assistance of counsel and require reversal of a conviction, Bonfilio must show two things: (1) Counsel's performance was deficient; and (2) Counsel's deficient performance caused her prejudice. Williams v. Taylor, 529 U.S. 362, 390-91 (2000) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)); see Ross v. Dist. Att'y of the Cnty. of Allegheny, 672 F.3d 198, 210 (3d Cir. 2012).

"To show deficient performance, 'a person challenging a conviction must show that counsel's representation fell below an objective standard of reasonableness. . . . The challenger's burden is to show that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'" Ross, 672 F.3d at 210 (quoting Harrington v. Richter, 131 S.Ct. 770, 787 (2011)).  When evaluating whether counsel's performance was deficient, the relevant inquiry is whether counsel's assistance was reasonable under the totality of the circumstances. Strickland, 466 U.S. at 688. Courts "must include a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689; see also United States v Gray, 787 F.2d 702, 711 (3d Cir. 1989) ("It is therefore only the rare claim of ineffectiveness of counsel that should succeed under the properly deferential standard to be applied in scrutinizing counsel's performance.") (citing Strickland, 466 U.S. at 689–90).

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." <u>Strickland</u>, 466 U.S. at 690. "Because advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed decisions, strategic choices must be respected . . . if they are based on professional judgment." <u>Strickland</u>, 466 U.S. at 681. "<u>Strickland</u> and its progeny make clear that counsel's strategic choices will not be second-guessed by post-hoc determinations that a different . . . strategy would have fared better." <u>Roland v. Vaughn</u>, 445 F.3d 671, 681-82 (3d Cir. 2006). "The Supreme Court directs that our 'scrutiny of counsel's performance must be highly deferential' to avoid holding counsel incompetent because of reasonable strategic or tactical judgments which, with the benefit of tactical hindsight, might prove not to have best served his client's interests." <u>United States v. Loughery</u>, 908 F.2d 1014, 1018 (D.C. Cir. 1990) (quoting <u>Strickland</u>, 466 U.S. at 689).

In the context of criminal defense, "certain litigation decisions are considered 'fundamental' and are for the client to make. These include decisions on whether to plead guilty, whether to testify, and whether to take an appeal. After consultation with the client, <u>all other decisions</u> fall within the professional responsibility of counsel." <u>Sistrunk</u>, 96 F.3d at 670 (citing <u>Jones v. Barnes</u>, 463 U.S. 745, 751 (1983)) (emphasis added).

"With respect to prejudice, a challenger must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" <u>Id.</u> In other words, a petitioner must show that there is a reasonable probability that her counsel's errors resulted in his conviction. <u>See</u> <u>Glover v. United States</u>, 531 U.S. 198, 203 (2001). Bonfilio must go beyond proving that counsel's unprofessional errors had "some conceivable

effect on the outcome of the proceeding." Strickland, 466 U.S. at 693. To establish prejudice, Bonfilio must also demonstrate that counsel's errors rendered the process fundamentally unfair or unreliable. See Lockhart v. Fretwell, 506 U.S. 364, 369–370 (1993) ("[A]n analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective . . . . To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him.").

Where the evidence is overwhelming in support of the jury's verdict, notwithstanding alleged deficiencies of counsel, it is difficult to conclude that there is a showing of prejudice. See Strickland, 466 U.S. at 695–96; Buehl v. Vaughn, 166 F.3d 163, 181-82 (3d Cir. 1999); Allen v. Chandler, 555 F.3d 596, 598 (7th Cir. 2009) ("even if counsel's performance was deficient, [Petitioner] was not prejudiced . . . because the evidence of guilt was overwhelming").

As both the deficiency and prejudice components must be demonstrated to support a claim of ineffective assistance, the absence of one negates the need to address the other. Strickland, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."). A court, therefore, need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. Marshall v. Hendricks, 307 F.3d 36, 87 (3d Cir. 2002) (citing Strickland, 466 U.S. at 697)); see McAleese v. Mazurkiewicz, 1 F.3d 159, 170 (3d Cir. 1993), cert. denied, 510 U.S. 1028 (1993) ("Indeed, this Court has read Strickland as requiring the courts to decide first whether the assumed deficient conduct of counsel prejudiced the defendant.") (quotations and citations omitted). By the same token, where a defendant fails to prove the reasonableness prong of

Strickland, a court need not reach the prejudice prong. See Werts v. Vaughn, 228 F.2d 178, 224 n.24 (3d Cir. 2000).

Bonfilio argues that her trial counsel, Steven Misko ("Misko" or "Counsel"), was ineffective because he:

> (1) advised Ms. Bonfilio that she would be held in contempt of court if she elected to testify;
>
> (2) failed to request and obtain evidence and perform a proper investigation; and
>
> (3) failed to file a motion in limine to exclude allegedly inauthentic documents.

As will be explained in detail below, Bonfilio is not entitled to relief on any of these grounds. Counsel's representation did not fall below an objective standard of reasonableness with respect to any of the errors she alleges. Even if Counsel's performance fell below that standard and was constitutionally deficient, Bonfilio could not establish a reasonable probability that, without the alleged errors, she would not have been convicted.

This court previously found that the evidence against Bonfilio was overwhelming. (ECF No. 225 at 130) ("I did hear the testimony at trial, and it was overwhelming in terms of what your role was and what your involvement was."); (see discussion supra Section II, at 2–3.) Where the evidence is overwhelming in support of the jury's verdict, it is difficult to conclude that there is a showing of prejudice. See Strickland, 466 U.S. at 695–96; Buehl, 166 F.3d at 181–82; Allen, 555 F.3d at 598. The purported legal errors made by Counsel, if they occurred, do not change the fact that the testimonial and documentary evidence establishing Bonfilio's guilt at trial was overwhelming.

**1. Bonfilio's decision not to testify**

Bonfilio argues that her Counsel prevented her from testifying at trial. She alleges that Counsel provided her with false information in order to keep her from testifying, when he warned her that the judge would hold her in contempt of court and pull her bond if she testified and her testimony provided no new information. Bonfilio alleges that this statement caused her extreme duress, and that as a result of Counsel's warning she agreed not to testify.

Bonfilio argues that she did not knowingly and intelligently make the decision to waive her right to testify on her own behalf, but instead was forced into making such a waiver. A defendant has the ultimate authority to decide whether or not to testify on her own behalf. Jones, 463 U.S. at 751; Riggins v. Nevada, 504 U.S. 127, 144 (1992). ("It is well established that the defendant has the right to testify on his own behalf, a right we have found essential to our adversary system."). That being said, courts have recognized that defendants who choose not to testify at trial and are subsequently convicted, may be compelled to claim that, but for pressure from defense counsel, they would not have waived their right to testify. United States v. Lore, 26 F. Supp. 2d 729, 737 (D.N.J. 1998) ("While a criminal defendant often has good reasons not to testify during trial, after conviction, the impulse to claim that his attorney 'would not let him' becomes compelling. A defense which fails after invoking one constitutional right should not get a second bite at the apple by invoking its converse.").

Courts are split on the question of how to adequately determine if a criminal defendant has knowingly and intelligently waived his right to testify. Several circuits place the burden on the defendants. Under this approach, a defendant who wishes to testify and is being silenced by defense counsel must make the trial court aware of his desire to testify. A defendant who fails to make the court aware of this desire cannot later claim his rights were violated. United States v. Joelson, 7 F.3d 174, 177 (9th Cir. 1993) ("[I]f the defendant wants to testify, he can reject his

attorney's tactical decision by insisting on testifying, speaking to the court, or discharging his lawyer. Thus, waiver of the right to testify may be inferred from the defendant's conduct and is presumed from the defendant's failure to testify or notify the court of his desire to do so."); United States v. Stover, 474 F.3d 904, 909 (6th Cir. 2007) ("Although the ultimate decision whether to testify rests with the defendant, when a tactical decision is made not to have the defendant testify, the defendant's assent is presumed. . . . [b]arring any statements or actions from the defendant indicating disagreement with counsel or the desire to testify.") (citations omitted).

Other circuits place the burden on defense counsel. In these circuits, defense counsel must ensure a defendant who waives her right to testify does so knowingly and intelligently. Sexton v. French, 163 F.3d 874, 908 (4th Cir. 1998) ("Because the burden of ensuring that a criminal defendant is informed of the nature and existence of the right to testify rests upon trial counsel, the burden shouldered by trial counsel is a component of effective assistance of counsel."); Brown v. Artuz, 124 F.3d 73, 79 (2d Cir. 1997) ("[C]ounsel must inform the defendant that the ultimate decision whether to take the stand belongs to the defendant, and counsel must abide by the defendant's decision on this matter."). Failure to meet this burden can serve as a basis for a claim of ineffective assistance of counsel.

The Third Circuit Court of Appeals has not spoken on this issue, and district courts within the circuit are split on the matter. *Compare* Berryman v. United States, Civ. Action 10-5243, 2012 WL 2997038, at *5 (E.D. Pa. July 20, 2012) ("a court may infer a defendant's waiver of his right to testify "from the defendant's conduct . . . [and] from defendant's failure to testify or notify the court of his desire to do so.") (citing *Joelson*, 7 F.3d at 177); *with* Lore, 26 F. Supp. 2d 729, 737–38 (D.N.J. 1998) (finding that defendant's silence did not constitute a waiver of his

right to testify, and that defendant had satisfied the first prong of the <u>Strickland</u> test, because "[i]t was the defendant's right ultimately to decide whether or not he would testify, and counsel's failure to ensure the defendant's waiver of this right was voluntary and knowing was not reasonable.").

Here, there is conflicting evidence about whether Bonfilio's decision to testify was knowingly and voluntarily made. Bonfilio contends that her counsel pressured her into waiving her right to testify by warning her that the judge would hold her in contempt and pull her bond if her testimony did not add any new information. (ECF No. 249 at 14.) The government argues that this information, if Counsel did in fact offer it, was sound tactical advice, as the court did have the discretion to revoke Bonfilio's bond if she testified and the court determined that she committed perjury. (ECF No. 254 at 10.)

While the court must "'accept the truth of [Bonfilio's] factual allegations,'" it may ignore factual allegations that are "'clearly frivolous on the basis of the existing record.'" <u>Tolliver</u>, 800 F.3d at 141. Bonfilio's assertion that her Counsel pressured her into waiving her right to testify is unsupported by the record. At sentencing, this court engaged in a colloquy with Bonfilio to ensure she understood her right to testify and was knowingly and voluntarily waiving that right:

> THE COURT: Ms. Bonfilio, do you understand you have the right to testify, if you chose to do so?
>
> THE DEFENDANT: Yes, ma'am.
>
> THE COURT: Have you discussed with your counsel the advantages and disadvantages of you exercising that right?
>
> THE DEFENDANT: Yes, I have.
>
> THE COURT: Have you made a decision about whether or not you wish to testify?

| | |
|---|---|
| THE DEFENDANT: | Yes, I have. |
| THE COURT: | What is your decision? |
| THE DEFENDANT: | On advice of counsel, I have decided not to. |
| THE COURT: | Do you have any questions about your right to testify? |
| THE DEFENDANT: | I do not believe so, no. |

. . . .

| | |
|---|---|
| THE COURT: | Has anyone forced you in any way not to testify? |
| THE DEFENDANT: | No, ma'am. |
| THE COURT: | Has anyone threatened you in any way to induce you not to testify? |
| THE DEFENDANT: | No, ma'am. |
| THE COURT: | So, is your decision not to testify based solely upon your own determination based upon your conversations with your counsel? |
| THE DEFENDANT: | Yes, ma'am. |

(ECF No. 171 at 84–86.)

Bonfilio's answers suggest that her decision not to testify was made knowingly, intelligently, and of her own free will. Bonfilio made a tactical decision based on advice from counsel. A strategic choice about whether a defendant should testify is the sort of professional judgment that is "virtually unchallengeable." Strickland, 466 U.S. at 690; see Carter v. Lee, 283 F.3d 240, 249 (4th Cir.2002) ("[T]he advice provided by a criminal defense lawyer on whether his client should testify is a paradigm of the type of tactical decision that cannot be challenged as evidence of ineffective assistance.") (citations omitted).

It is the court's view that the proffered evidence does not support Bonfilio's claim that counsel provided constitutionally deficient assistance under the first prong of Strickland. Underwood v. Clark, 939 F.2d 473, 476 (7th Cir. 1991) ("in a subsequent collateral attack on [a] conviction the defendant must produce something more than a bare, unsubstantiated, thoroughly self-serving, and none too plausible statement that his lawyer (in violation of professional standards) forbade him to take the stand."). The court, however, need not rest its conclusion on the deficiency prong of the Strickland test, as Bonfilio's claim plainly fails under Strickland's prejudice requirement.

Bonfilio argues that had she testified, as she was wont to do prior to Counsel's admonishment, there is a reasonable likelihood that the outcome of her proceedings would have been different. Bonfilio asserts that she would have been able to impeach government witnesses and explain numerous forgeries of her signature; however, Bonfilio provides no specificity with respect to which witnesses she would have impeached and which forgeries her testimony would have addressed, and she does not explain how her testimony would have accomplished these objectives. Her contentions are conclusory and do not demonstrate a reasonable possibility that, had she testified, the result of her proceedings would have been different. Sistrunk, 96 F.3d at 670 (3d Cir. 1996) ("To establish ineffective assistance of counsel, a defendant must show . . . there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.").

The likelihood that Bonfilio's testimony would have affected the outcome of her proceedings is further undercut by the overwhelming nature of the testimonial and documentary evidence presented by the government at trial. (See discussion supra Section II, at 2–3.) Even if the court were to find that her counsel's representation was deficient, Bonfilio did not show that

she suffered prejudice as a result of this deficiency. Because the evidence against Bonfilio was overwhelming and she did not show, beyond mere conclusory allegations, that her testimony would have affected the outcome of the verdict, Bonfilio did not establish a right to relief under this ineffective assistance of counsel claim.

### 2. Counsel's failure to review materials on a view only computer

Petitioner claims that Counsel did not undertake a reasonable investigation, because he failed to review materials located on a view only computer in the U.S. Attorney's office. (ECF No. 249 at 16.) Bonfilio claims that had Counsel reviewed these materials he would have uncovered documents that could have been used to impeach government witnesses and to support defense's theory of the case.

Bonfilio presents no credible evidence that Counsel's investigation was unreasonable. First, Bonfilio's claim that materials in her case were available on a view only computer at the U.S. attorney's office is unsupported by the records. Bonfilio bases her assertion that there was relevant material available on a view only computer in the U.S. attorney's office on the fact that the government used a view only computer to disclose materials to defendants in United States v. Kubini, 19 F. Supp. 3d 579 (W.D. Pa. 2014) (ECF No. 249 at 16.); however, Bonfilio provides no evidence that the government used a view only a computer in her case, and the government explicitly stated that such a computer was not used in this case. (ECF No. 254 at 11.)

Second, even if the court were to assume, based on Kubini, that the government regularly makes materials available on view only computers, Bonfilio's claim that the computer contained exculpatory materials is without merit. Bonfilio alleges that the view only computer contained materials from a hard drive confiscated at Kitay's and her home. In particular, Bonfilio alleges

that the hard drive contained exculpatory emails that could have affected the outcome of her case. (ECF No. 249 at 17.)

The proceedings in Kubini do not support Bonfilio's claim that the alleged view only computer included materials from her personal hard drive. In Kubini, the view-only computer contained "interview reports, grand jury testimony, plea agreements, Presentence Investigation Reports, and related documents." (CR 2:110-cr-00014, ECF No. 213 at 1–2.) Bonfilio has provided no evidence, and the record in Kubini does not imply, that the view only computer used in Kubini contained any sort of evidence akin to a defendant's computer hard drive. Bonfilio adds "the computer hard drive taken from Ms. Bonfilio and Ms. Kitay's home" to the list of items enumerated in Kubini without any explanation or support for this addition. (ECF No. 249 at 17.) The inclusion of the hard drive is essential to Bonfilio's ineffective assistance of counsel claims, as all the exculpatory evidence which she maintains Counsel should have uncovered and used at trial, was allegedly located on the hard drive. Because all the exculpatory materials Bonfilio references were on the hard drive and there is no evidence that this hard drive was available on the view only computer, Bonfilio's claim that she experienced prejudice due to Counsel's failure to access the view only computer is conclusory and, as a matter of law, does not support her request for a § 2255 hearing.

Even if the view only computer existed and contained the emails Bonfilio describes, Counsel's investigation will only be deemed deficient if his decision not to view the computer was unreasonable. "In the context of ineffective assistance based on counsel's failure to investigate, the court must determine whether counsel exercised 'reasonable professional judgment.'" Jacobs v. Horn, 395 F.3d 92, 102 (3d Cir. 2005). "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the

circumstances, applying a heavy measure of deference to counsel's judgments." <u>Strickland</u>, 466 U.S. at 691; <u>Wiggins v. Smith</u>, 539 U.S. 510, 523 (2003) (citing <u>Strickland</u>, 466 U.S. at 688) ("In assessing counsel's investigation, we must conduct an objective review of their performance, measured for 'reasonableness under prevailing professional norms,' which includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'").

Here, Bonfilio suggests that Counsel should have known about the view only computer based on the <u>Kubini</u> decision. The opinion in <u>Kubini</u>, however, was published on May 13, 2014, nearly two years after Petitioner was found guilty. Counsel is required to conduct a reasonable investigation based on his perspective at the time of the investigation. <u>Wiggins</u>, 539 U.S. at 523. It is not reasonable to assume Counsel knew or should have known about the alleged view only computer based on the fact that such a computer existed in a later case. It is particularly unreasonable to require Counsel to view a computer housed at the U.S. Attorney's Office, when this office has stated that such a computer does not exist. Bonfilio, therefore, did not establish a right to relief under this claim.

### 3. Forged and inauthentic documents

Bonfilio contends that she was denied her right to effective assistance of counsel, because her Counsel did not challenge what she characterizes as forged and inauthentic documents. Bonfilio does not name specific documents, and instead states "documents included, but not limited to HUDS, sales agreements, verifications, incorrect chart authored by Tom Fornataro, misleading transcript recording and the vast majority of search warrant documents." (ECF No. 249 at 19.)

As summarized above, the authority to make decisions regarding the conduct of a criminal case is divided between lawyer and client. <u>Jones</u>, 463 U.S. 745 at 751. Certain decisions are "fundamental" and reserved to the client, such as deciding whether to plead guilty. <u>Id</u>. Deciding whether to seek the exclusion of certain evidence is a strategic decision, not a "fundamental" right. Under such circumstances, the court's "'scrutiny of counsel's performance must be highly deferential' to avoid holding counsel incompetent because of reasonable strategic or tactical judgments which, with the benefit of tactical hindsight, might prove not to have best served his client's interests." <u>United States v. Loughery</u>, 908 F.2d 1014, 1018 (D.C. Cir. 1990) (quoting <u>Strickland</u>, 466 U.S. at 689). Counsel's strategic decision not to seek the exclusion of the evidence Bonfilio references does not fall below an objective standard of reasonableness and certainly did not constitute the "practical equivalent of a plea of guilty." <u>Allerdice v. Ryan</u>, 395 F. App'x 449, 452 (9th Cir. 2010) (citing <u>Brookhart v. Janis</u>, 384 U.S. 1 (1966)).

Even if Counsel's representation was constitutionally deficient in this regard, Bonfilio cannot establish that she would not have been convicted were it not for Counsel's errors. <u>Glover</u>, 531 U.S. at 203. Bonfilio cites a myriad of documents to which Counsel should have objected. She references most of the documents in vague terms and fails to explain how the proceedings in her case would have been altered had Counsel sought and won motions to exclude this evidence. Bonfilio refers explicitly to only two exhibits. She cites a verification of income identified as SW-2 and a chart authored by IRS agent Fornataro. In discussing the verification of income, Bonfilio makes no claim that this item was inauthentic or that it could have been excluded at trial. She also does not explain how the admission of this document prejudiced her case. With respect to the chart authored by agent Fonatora, Bonfilio lays out what she believes to be several

mistakes in this document, but does not explain how these mistakes could or did affect the outcome of her case.

Bonfilio's claim that there was a reasonable probability of a different outcome in her case had this evidence been excluded at trial is conclusory. This assertion is also not supported by the record. Where the evidence is overwhelming in support of the jury's verdict it is difficult to conclude that there is a showing of prejudice. See Strickland, 466 U.S. at 695-96; Buehl, 166 F.3d at 181–82. The evidence presented here was overwhelming; the government presented hundreds of documents, a tape recorded conversation where Bonfilio incriminated herself, and testimony from Bonfilio's coconspirators, business associates, and victims, as well as testimony from industry experts. The government's case was not dependent upon any single piece of documentary evidence, including the items Bonfilio cites in her motion.

It was not unreasonable for trial Counsel to proceed without seeking to exclude the evidence Bonfilio cites in her motion, and there was not a reasonable probability that the outcome of Bonfilio's case would have been different if Counsel had sought and won such exclusions. Bonfilio's § 2255 motion did not satisfy the Strickland standards; therefore, Bonfilio establishes no right to relief on the basis of her ineffective assistance of counsel claim.

### V.  Need for an Evidentiary Hearing

For the reasons set forth above, Bonfilio's motion will be denied.  The motion, files, and records of this case show conclusively that Petitioner failed to demonstrate that due process violations or prosecutorial misconduct occurred at her trial. Petitioner also failed to establish that her trial counsel was ineffective. Under these circumstances, there is no reason to conduct an

evidentiary hearing with respect to Bonfilio's claims. Bonfilio is not entitled to relief on any ground.

**VI**.        **Certificate of Appealability**

When a district court issues a final order denying a § 2255 motion, the court must also make a determination about whether a certificate of appealability ("COA") should issue or the clerk of the court of appeals shall remand the case to the district court for a prompt determination about whether a certificate should issue.  See 3rd Cir. LAR. 22.2.

> When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the Petitioner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

Slack v. McDaniel, 529 U.S. 473, 484 (2000).

Based upon the motion, files and records this instant case, and for the reasons set forth herein, Petitioner did not show a denial of her constitutional rights. A COA will not issue.

/s/ Joy Flowers Conti
Joy Flowers Conti
Chief United States District Judge

Date: October 20, 2016